**SO ORDERED.**

**SIGNED this 12 day of February, 2010.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ANTHONY JAMES BUCKLAND and | ) | |
| BETTY ELIZABETH BUCKLAND, | ) | Case No. 09-40010 |
| | ) | |
|             Debtors. | ) | |
| _____ | ) | |
| ANTHONY JAMES BUCKLAND, | ) | |
| | ) | |
|             Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-7011 |
| | ) | |
| EDUCATIONAL CREDIT MANAGEMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
|             Defendant. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION AND ORDER DENYING DISCHARGE OF
### STUDENT LOAN DEBT

This matter is before the Court on Plaintiff's Adversary Complaint,[1] which seeks a determination that repayment of his student loan debt owed to the Defendant, Educational Credit Management Corporation ("ECMC"), would constitute an undue hardship and, therefore, that the debt is dischargeable pursuant to 11 U.S.C. § 523(a)(8).[2] The Court conducted a trial, reviewed all the evidence submitted in this case, weighed the credibility of the witnesses, and is now prepared to rule. This is a core matter over which this Court has jurisdiction.[3]

I.     **FINDINGS OF FACT**

The Court makes the following findings of fact based upon the stipulations entered into between the parties in the Pretrial Order,[4] and the evidence presented at trial. Debtors were 45 and 47 years of age, respectively, when they filed their voluntary petition under Chapter 7 of the Bankruptcy Code on January 6, 2009.[5] No one is dependent on them for support, although Mrs. Buckland is required to pay $140/month in child support for a 12 year old child who lives with his father.

---

[1]Doc. 1.

[2]This bankruptcy was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101-1532 (2005), unless otherwise specifically noted.

[3]28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(I) (core proceeding).

[4]Doc. 69.

[5]Exhibit F.

2

According to Debtors' Statement of Financial Affairs, neither has been employed since May 14, 2007. Debtors were granted a discharge pursuant to 11 U.S.C. § 727 on April 20, 2009.

On February 12, 2009, Debtors initiated this adversary proceeding, seeking a determination that the repayment of their respective student loan debts would create an undue hardship on them, and that all their student loan debts should thus be discharged. Mrs. Buckland was an original plaintiff, and the Department of Education a defendant, because she sought the discharge of approximately $40,000 in student loans she owed to the U.S. Department of Education. Mr. Buckland's cause of action centered on a July 24, 2002 consolidated loan currently held by Educational Credit Management Corporation ("ECMC"). The amount due and owing on the consolidation loan with ECMC, as of March 25, 2009, was $75,018.81, with interest accruing at the fixed rate of 6.25%.

According to Debtors, several factors beyond their control have left them without the ability to repay their student loan debts. Among these include the tragic death of their teenaged daughter in April 2008 from cancer[6] and the resulting emotional difficulties experienced by both Debtors following her death. Mrs. Buckland also testified that she suffers from physical ailments that prevent her from working, including back problems resulting from an injury she sustained while working as a nurse's aid.

---

[6]The Court recognizes that this child was Mrs. Buckland's biological child, and Mr. Buckland's step-daughter. However, the Court will refer to the child as "their" daughter, as Debtors did at trial, because it is clear that both Debtors considered this child to be their daughter.

3

The U.S. Department of Education recently elected not to contest a finding of undue hardship as it related to Mrs. Buckland, and an agreed Journal Entry finding her $40,000 debt dischargeable has been entered.[7] Thus, Mr. Buckland's debt to ECMC is the only claim that remained for trial.

Mr. Buckland claims that his extended period of unemployment is due to factors outside his control. While he was helping care for their dying daughter, he was terminated from his employment with the Mission Township Fire Department in May 2007, and he has not been steadily employed since. Mr. Buckland also testified that he successfully operated a business known as B&B Contractors from 1989 until 2005. The company performed radon testing, but he had stopped operating the radon business because he could not simultaneously handle that business and his firefighting responsibilities. Mr. Buckland testified that he attempted to restart this business after he lost his job in 2007, but quickly decided the current housing market made his attempt to make a profit from that business impossible.

Mr. Buckland does not contend that he is physically or emotionally unable to work, but rather that he has had difficulty finding employment since his involuntary departure from the Mission Township Fire Department, where he was the Chief for two years.[8] He claims he has been "blackballed" and that is why he is not getting hired in this geographic area notwithstanding that he was the prior medical, fire and water rescue trainer for the Township

---

[7] See Journal Entry Granting Discharge of Student Loan Debts Owed to the United States of America on Behalf of the Department of Education by the Plaintiff, Betty Elizabeth Buckland (Doc. 64) entered October 2, 2009.

[8] *See* response to Interrogatory 4, Exhibit M.

4

(and the team leader), had excellent firefighter and management skills, was the fire chief, and notwithstanding that he can still pass the strength and agility tests for firefighters. Both he and his brother, who testified on his behalf, say he is physically capable of doing any job, because he is strong and "very healthy." His brother noted he would be an excellent candidate for a variety of jobs, including substitute teacher or home security positions, neither of which category of job he has apparently applied for since losing the firefighter job.

Debtor also admitted that he

> "holds certification in ice water rescue, dive rescue, jet ski rescue, swift water rescue, flood water rescue, Kansas emergency medical tech-intermediate, National firefighter 1&2, national incident command system-100, 200,700, wild land firefighter, PADI & NAUI dive master, underwater investigator, Kansas mobile live fire instructor, Kansas fire inspections, National fire training officer 1&2, Kansas emergency medical training office 1&2, BA in Anthropology, minors in history and mental health care from Washburn University. Cert in Heating & Air Conditioning from Kansas City Vo-Tec."[9]

On his Schedule I filed with the Petition, he listed his occupation(s) as "Radon Contractor/Firefighter/EMT." Debtor agreed at trial he was still a qualified EMT. Accordingly, even Mr. Buckland perceives he has many skills that could lead to employment.

The Court also notes that Debtor received some Honor Roll grants while attending school; the fact that he did well in school was corroborated by Debtor's testimony. The Court found Debtor to be quite articulate, with an excellent vocabulary, and the ability to

---

[9]*See* Exhibit L, Debtor's responses to Interrogatory No. 9. In a supplemented response, he also included that he held a certification or license as an Interior Structure Fire Instructor, SCBA Fit Tester, DRI Underwater Scene Investigator, DRI Swift-Water Rescuer, FEMA Incident Command Systems, Kansas EMT-I, and National Environment Health Association Radon Mitigation Contractor. *See* Exhibit M, Interrogatory No. 9.

formulate logical answers to questions. He also represented himself in this Adversary Proceeding, and did a good job in doing so. All of these attributes would serve Debtor well in seeking and maintaining employment.

Debtors testified that they have taken serious measures to limit their living expenses. They testified they no longer eat out or enjoy entertainment that comes with a cost. They have eliminated cable television, eliminated their land-line telephone, and now share a cell phone plan with another daughter. Finally, Debtors were able to obtain a loan modification on their home mortgage, which reduced their monthly house payments. According to Schedule J filed in Debtors' bankruptcy case, their current monthly expenses are just over $1,900.00.

Additional facts will be discussed below, when necessary.

## II.    ANALYSIS

The Bankruptcy Code is generally designed to provide debtors with the opportunity to obtain a "fresh start" by eliminating or restructuring their debts. However, there are certain debts Congress has determined should either not be discharged in a bankruptcy petition, or that can only be discharged under limited circumstances. As one of these exceptions to a full fresh start, the Bankruptcy Code creates a presumption that student loans

6

are non-dischargeable in the absence of undue hardship to the debtor or the debtor's dependents.[10] The Debtor has the burden of proving that the student loan is dischargeable.[11]

The Tenth Circuit has adopted the three-part *Brunner* test for analyzing whether a debtor has shown that his or her student loan debt should be discharged because it would cause undue hardship.[12] Under this test, a debtor must prove:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself or her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; **and**

(3) that the debtor has made good faith efforts to repay the loans.[13]

If the court finds the debtor has failed to prove any of these three elements, the inquiry ends and the student loan is not dischargeable.[14] As noted recently by the Tenth Circuit Bankruptcy Appellate Panel, the Tenth Circuit "makes it clear that it disdains 'overly

---

[10] 11 U.S.C. § 523(a)(8).

[11] *See In re Lindberg,* 170 B.R. 462 (Bankr. D. Kan. 1994).

[12] *Educ. Credit Mgmt. Corp. v. Polleys (In re Polleys)*, 356 F.3d 1302, 1309 (10th Cir. 2004) (holding that the Tenth Circuit would adopt three-pronged test established by *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2nd Cir. 1987)).

[13] *Id.* at 1307.

[14] *Id.*

7

restrictive' interpretations of this test, and concludes that it should be applied to 'further the Bankruptcy Code's goal of providing a 'fresh start' to the honest but unfortunate debtor[.]'"[15]

The first prong of the *Brunner* test requires Debtor to demonstrate "more than simply tight finances."[16] The Court requires more than temporary financial adversity, but typically stops short of utter hopelessness.[17] "A minimal standard of living includes what is minimally necessary to see that the needs of the debtor and [his] dependants are met for care, including food, shelter, clothing, and medical treatment."[18] Further, a court should also be hesitant to impose a spartan life on family members who do not personally owe the underlying student loan, particularly when those family members are children.[19] All of Debtor's children are adults; none reside with him or depend upon him for support (except that Mrs. Buckland is required to pay $140/month child support for her child who lives with his father).

The second prong of the *Brunner* test, which requires that additional circumstances exist indicating that the Debtor will be unable to repay the loans while maintaining a minimal standard of living for a significant portion of the repayment period, "properly recognizes that a student loan is viewed as a mortgage on the debtor's future."[20] However, the debtor need

---

[15] *Alderete v. Educ. Credit Mgmt. Corp.,* BAP No. NM-02-089, slip op. at 9 (BAP 10th Cir., April 16, 2004).

[16] *See Innes v. State of Kansas (In re Innes)*, 284 B.R. 496, 504 (D. Kan. 2002).

[17] *Id.*

[18] *Id.*

[19] *Windland v. United States Dept. of Educ. (In re Windland)*, 201 B.R. 178, 182-83 (Bankr. N.D. Ohio 1996).

[20] *Polleys*, 356 F.3d at 1310 (internal quotations omitted).

8

not show a "certainty of hopelessness."[21]  Instead, the Court must take a realistic look into the debtor's circumstances and the debtor's ability to "provide for adequate shelter, nutrition, health care, and the like."[22]

The third prong of the *Brunner* test requires the Court to determine if the debtor has made a good faith effort to repay the loan "as measured by his [or] her efforts to obtain employment, maximize income and minimize expenses."[23]  The inquiry into a debtor's good faith "should focus on questions surrounding the legitimacy of the basis for seeking a discharge."[24]  A finding of good faith is not precluded by a debtor's failure to make a payment.[25]  "Undue hardship encompasses a notion that a debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his control."[26]

The Tenth Circuit has also held that a debtors' willingness to consolidate his loan under the William D. Ford Federal Direct Student Loan Program's[27] Income Contingent Repayment Plan ("ICRP") or Income Based Repayment ("IBR") is an important factor to

---

[21]*Id.*

[22]*Id.*

[23]*In re Innes*, 284 B.R. at 510.

[24]*Polleys*, 356 F.3d at 1310.

[25]*In re Innes*, 284 B.R. at 510.

[26]*In re Faish*, 72 F.3d 298, 305 (3rd Cir. 1995).

[27]20 U.S.C. § 1087e(d)(1)(D); 34 C.F.R. § 685.100 *et seq.*

9

consider in determining whether a debtor has made a good faith effort to repay a student loan debt.

According to the evidence presented at trial by way of an affidavit submitted by ECMC,[28] under either the ICRP or the IBR, a debtor is allowed to repay a student loan debt over a period of up to 25 years and the amount of payments required under an ICRP are contingent upon the debtor's income.[29] Under the ICRP, if a debtor is making less than 100% of the federal poverty line (which is the case here), then no payments are required. If the debtor earns more than the federal poverty line, the payments are capped at 20% of the debtor's adjusted gross income that exceeds that amount. Similarly, under the IBR, if a debtor is making less than 150% of the federal poverty line (which is the case here), then no payments are required. If the debtor earns more, the loan payment is capped at 15% of the amount earned over that level. Apparently except for the highest earners, that usually works out to less than 10% of a debtor's income. In addition, there is some forgiveness of debt for public service, including jobs providing for public safety. Any debt that remains due at the end of the 25 year period is forgiven.

The Tenth Circuit has also clarified that its adoption of the *Brunner* test does not "rule out consideration of all the facts and circumstances" surrounding the case.[30] The first prong

---

[28]ECMC Exhibit AA.

[29]According to the affidavit, the ICRP is available to any borrower, while the IBR is available to borrowers who can make a showing of partial financial hardship, meaning that the standard (10-year) repayment amount exceeds 15% of the household adjusted gross income. It appears that Debtor would be eligible under either of these programs.

[30]*In re Polleys*, 356 F.3d at 1309.

10

of the *Brunner* test, whether the debtor can maintain a minimal standard of living while repaying the debt, "necessarily entails an analysis of all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level."[31]  The second prong of the *Brunner* test "similarly requires an analysis of all the facts and circumstances that affect the debtor's future financial position."[32]  Finally, the third prong "includes an analysis of the debtor's situation in order to determine whether he has made a good faith attempt to repay the loan by maximizing income and minimizing expenses."[33]  In addition, the Tenth Circuit has been clear in holding that the terms of the *Brunner* test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged.

> **1.    Debtor has shown that, given his current income and expenses, he cannot maintain a minimal standard of living while repaying the student loan debt.**

The first prong of the *Brunner* test requires Debtor to demonstrate that he cannot maintain a minimal standard of living while repaying the student loan debt given his current income and expenses.  The Court finds that Debtor easily met this prong, and that ECMC did not seriously contest this evidence.  Mrs. Buckland has been unemployed since December 2006 and Mr. Buckland has been unemployed since May 2007.  Neither Debtor has any income, and neither one has had any for nearly three years.

---

[31]*Id.*

[32]*Id.*

[33]*Id.*

Apparently Debtors have been living solely off the generosity of family, unemployment benefits, occasional sales of plants at farmers markets, and food stamps to help cover necessary living expenses during this time.  The testimony at trial indicated that both of those streams of income have likely either dried up, or are soon to dry up, although Mrs. Buckland has applied for (and been denied) some disability benefits.  Based on the fact that neither Debtor has any regular income, the Court finds that he has shown that he lacks the ability to maintain a minimal standard of living if forced to repay the student loan debts at this time.

      **2.**      **Debtor has not shown that there are any additional circumstances that exist indicating the current state of affairs is likely to persist for a significant portion of the repayment period of the student loans.**

Although the Court finds that Debtor currently lacks the ability to repay his student loan debt, Debtor failed to show that his current state of affairs is likely to persist for a significant portion of the repayment period of the student loan (unless he chooses for it to persist).  In analyzing this prong of the *Brunner* test, the Court is required to take a "realistic" look into Debtor's circumstances.

The Court finds that although Mrs. Buckland is currently unable to work, it is more likely than not that her inability to work will not continue for a significant period of time.  Five significant pieces of evidence concerning Mrs. Buckland's future employment were admitted into evidence.  The first was a letter written by her primary care physician, Dr. Norris.  In that letter, dated November 17, 2008, Dr. Norris indicates that "Betty Buckland

12

has suffered significant stress since the death of her daughter last spring. She has been unable to work. **Her mental health is improving and she will hopefully be able to return to work in the future.** She is unable to work at this time. If I can be of further help, please feel free to contact me."[34]

The second piece of evidence was contained on Debtors' Schedule I, current Income of Individual Debtor(s). One of the Debtors wrote, in freehand, at the bottom of this schedule, filed with the Petition on January 6, 2009, "Hope there is income of some kind soon!"[35] In that same Schedule, Debtors indicated that she had previously worked as a "CNA," which the Court assumes from her testimony means a certified nurse aide/assistant.

The third piece of evidence came in the form of Debtors' amended Schedule I, filed January 20, 2009. This time one of them wrote at the bottom "We hope to develop employment in the first few months of 2009."[36] Both of these Schedule I exhibits show that at least before they filed this adversary proceeding, they intended to get new employment. Fourth, Mrs. Buckland had applied for disability benefits, but had recently been denied, indicating that at least some governmental entity has recently decided she does not meet the required qualifications for those benefits. Finally, in responses to Interrogatory No. 23, Betty

---

[34]Emphasis added.

[35]Exhibit F.

[36]Exhibit H.

indicated she had been looking for work, which shows she did not, at that point, think she was unemployable.[37]

Although it is unclear precisely when Mrs. Buckland will be able to return to gainful employment, Debtors themselves, and Mrs. Buckland's physician, all thought it was likely to occur in 2008 or 2009. As noted above, it is Debtor's burden to prove that he will not be able to make payments on the student loan debts for a significant portion of the repayment period, and the Court finds Debtor has failed to show that his wife will not be able to re-enter the work force if she chooses to do so for some portion of the repayment period on his loans. Because they testified that they share all income and expenses equally, if she were to return to work, the funds would be available to either defray living expenses, or to assist in payment of the student loans.

The Court finds that Mr. Buckland's prospects for becoming gainfully employed are admittedly much clearer (and better) than those of his wife. By all accounts, Mr. Buckland is a very healthy, able-bodied individual with a college degree and significant work and management skills and experience. His brother testified that he was qualified to do many jobs, and Mr. Buckland admitted as much, himself.

The Court simply finds there are no additional facts or circumstances that lead the Court to believe Mr. Buckland's unemployment is likely to last a significant portion of the repayment period, provided he makes a good faith, conscientious effort to obtain future

---

[37]Exhibit O, Interrogatory 23.

14

employment. Although that employment may not be in his chosen profession of firefighting, or at the wages he would like, there is no reason to believe that employment is not on the horizon if he truly wants it to be.

### 3. Debtor has not shown that he has made a good faith effort to repay the student loan debt.

The final prong of the *Brunner* test requires Debtor to show that he has made a good faith effort to repay the loans. As noted above, this inquiry is measured by Debtor's "efforts to obtain employment, maximize income and minimize expenses,"[38] and "should focus on questions surrounding the legitimacy of the basis for seeking a discharge."[39] The Court finds the evidence at trial did not establish that Debtor had made a good faith effort to repay the loans.

First, the Court notes that Debtor never made a single payment after his loans were consolidated. The loans were consolidated in July 2002, which was well prior to their daughter's illness, death and his ensuing unemployment. Debtor was employed in a job he liked (in fact, two jobs for a time), and when he signed the loan documents in 2002, he promised to make payments around $480 a month. Although the failure to make any payments is not, by itself, sufficient to support a finding of a lack of good faith, it is a

---

[38]*In re Innes*, 284 B.R. at 510.

[39]*In re Polleys*, 356 F.3d at 1310.

15

relevant factor for the Court to consider, especially when no payments were made during a time in which Debtors were both employed and had steady income.[40]

Second, the Court does not find that Debtor has made a good faith effort to maximize his income or obtain employment in an effort to repay the student loan debt. Mr. Buckland previously worked as firefighter in the Topeka area. That employment was terminated in May 2007, and he has remained unemployed since. The evidence at trial showed that Mr. Buckland has sought very few employment opportunities outside of the firefighting profession (and almost all of those types of jobs he applied for were at management levels). In addition, although he generically stated he had applied for jobs "all over the nation," he then admitted it would be extremely difficult for him to relocate (without ever explaining why). The Court did not find credible his testimony that he conducted an active, nationwide search for jobs.

In fact, Mr. Buckland testified that in addition to applying for several <u>chief</u> firefighter positions or director positions in close-by communities, as well as apparently one line-firefighter position in Shawnee Heights, the only jobs he has applied for over a 30-month period were several positions with Stormont Vail hospital, a position at the Target Distribution Center in Topeka, one application at one Mexican food restaurant, at a brother-in-law's auto shop, and on-line for unidentified civilian positions at Ft. Riley and Ft. Leavenworth. Although Mr. Buckland may have applied for other jobs, there was no

---

[40]Debtors were not married to each other in 2002, instead becoming common law married in 2006, but Mr. Buckland's former spouse was employed during this time, although she did not make much money.

16

evidence that those efforts were widespread or in any way intensive, and he provided no documentary proof of those applications at trial.

Mr. Buckland also testified that he tried to renew his former radon inspection business, but indicated that the current housing market has all but eliminated any possibility of turning that into a profitable business at this time, or for the foreseeable future. Given that Mr. Buckland has been unemployed for nearly three years, commencing at a time when the employment market was not as depressed as it is now, the Court finds the evidence he presented regarding his efforts to obtain new employment does not support a finding of a good faith effort to maximize his income so he could repay his student loans. For whatever reason, Debtor seems satisfied with living at his below-poverty level.

The Court finds that Debtor's failure to obtain employment over the past few years is attributable to two factors. First is the April 2008 death of their daughter. The Court understands the devastating effect such a loss (and the illness leading up to the death) would have on any family, and certainly places no fault on Debtors for failing to obtain employment during the time of their daughter's illness and for a reasonable time following her death.[41] And although Mrs. Buckland may have residual issues making employment difficult (as the Department of Education apparently concluded when agreeing to discharge her loan), Mr.

---

[41]Debtor admitted into evidence some rejection letters for a few jobs. Those letters were dated both before and after the death, so it appears Debtor did make minimal effort to find jobs during the illness and in the period soon afer her death.

Buckland has indicated both an ability and an interest in returning to work following the death of his daughter.

The Court finds that Mr. Buckland's lack of employment is more directly attributable to the second factor—a desire to limit his employment to a particular profession, and to predominantly management positions within that profession, at that. The Court certainly understands Mr. Buckland's desire to return to his chosen profession, but also finds that such a desire should have by now given way to the need to pay his debts, including the student loan debt. If in fact Mr. Buckland were making a good faith effort to repay his student loan debt, the Court finds that he would have made a much more determined, and broadened, effort to obtain employment.

Finally, the Court also finds that Debtor's refusal to consider the William D. Ford ICRP or IBR also supports a finding that he has not made a good faith effort to repay the student loan debt. Under both of these plans, the amount of monthly payments on the student loan debt is calculated based upon Debtor's monthly income. If Debtor earned less than 100% of the federal poverty line (150% for the IBR), he would not be obliged to make any payments while that condition persisted. After 25 years, any remaining debt would be forgiven. The failure to seriously consider these alternatives is an important factor to consider in the good faith analysis.[42]

---

[42]*In re Alderete,* 412 F.3d 1200, 1206 (10th Cir. 2005).

18

Mr. Buckland testified he was not interested in the ICRP for two reasons.[43]  First, under the ICRP, payments can be spread out over as long as 25 years, which would mean Mr. Buckland would be 72 when he emerged from the repayment plan.  Second, Mr. Buckland is concerned that there could be significant tax consequences when any remaining debt is forgiven, if in fact he is unable to repay the entire debt over 25 years.  Mr. Buckland suggested the ICRP was essentially an "invisible debtor's prison."

The Court understands Mr. Buckland's concerns about the ICRP, and does not find his refusal to take part in that program to be a major factor in finding that he had not made a good faith effort to repay the debt.  However, the Court finds that his refusal to consider the program is a factor in the Court's decision, even if it is not a major factor.  Although the Court understands Mr. Buckland's reluctance to deal with this student loan debt until he is 72 years old, the Court must also note that Mr. Buckland elected to take out the vast majority of those loans when he was in his mid-30's (1995-1997).  Further, he opted to consolidate them when he was over 40 years of age.  Debtors who opt to take out student loans later in life to further their education, which this Court believes is a very worthwhile endeavor, should not then be allowed to use their age as an excuse why they should not have to repay

---

[43]At trial, the testimony centered almost exclusively on the "ICRP" rather than the "IBR."  However, based upon the information contained in the affidavit contained in Exhibit AA, it appears as though the program that was actually being discussed was the IBR, based upon ECMC's counsel's assertions that the payments would be limited to 15% of Debtor's income that exceeded 150% of the federal poverty line.  In any event, Debtor did not indicate a willingness to enter into either of these programs, and his reasons for refusing to do so would apply equally under either program.

19

those loans.[44]  Lenders would be reluctant to provide student loans to older than average students if that were the case.

As for the concern about the potential future tax consequences if any of the debt is forgiven, the Court finds those concerns are legitimate, albeit somewhat speculative, since it is unknown whether there actually will be tax consequences if that debt is forgiven in 25 years, or even if there will be any debt to forgive at that point.  The Court finds that Mr. Buckland's desire to avoid repaying any of his student loan debt because there is a possibility of negative tax consequences several years into the future does not support a finding of good faith.

## III.  CONCLUSION

For the foregoing reasons, the Court finds that the student loan debt owed by Mr. Buckland to ECMC should be excepted from Debtor's discharge pursuant to 11 U.S.C. § 523(a)(8).  Although the Court finds that Debtor cannot repay the student loan debt and maintain a minimal standard of living at this time, the Court also finds that Debtor's current financial situation is not likely to (and need not) continue for a significant portion of the repayment period of these student loans, and that Mr. Buckland has not made a good faith effort to maximize his income, or to repay the loans.  Based upon these findings, the Court finds that the repayment of the student loan debt should not be discharged.

---

[44]*Cf. In re Woody*, 494 F.3d 939, 954 (10th Cir. 2007) (holding, admittedly in a HEAL loan context, that Congress did not intend to allow a debtor who spent decades not making loan payments, even after working full time for several years, to receive a discharge because his health begins to fail as he approaches retirement age).

20

**IT IS, THEREFORE, BY THE COURT ORDERED** that student loan debt owed by Anthony Buckland to Educational Credit Management Corporation is excepted from Debtor's discharge.

**IT IS FURTHER ORDERED THAT** judgment is entered against Plaintiff, Anthony Buckland, and in favor of Defendant, Educational Credit Management Corporation, on Anthony Buckland's complaint.

###

21